IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

CONSTANCE MORGAN,

    Plaintiff,

v.

TROKAMED GmbH, and MARKET-TIERS, INC. d/b/a
WISAP AMERICA d/b/a BLUE ENDO,

    Defendants.

OPINION & ORDER

18-cv-342-jdp

---

This is a products liability case. Plaintiff Constance Morgan's claim focuses on devices called "laparoscopic power morcellators," which are defined by the Food and Drug Administration (FDA) as "Class II medical devices used during laparoscopic (minimally invasive) surgeries to cut tissue into smaller pieces so the tissue can be removed through a small incision site (typically 2 cm long or less)."[1] Morgan alleges that a morcellator used during her hysterectomy in February 2014 caused the spread of uterine cancer.

Morgan is suing defendant Trokamed GmbH (a German company that manufactures the device at issue) and defendant Market-Tiers, Inc., which the parties call Blue Endo (the North American distributor of the device). The question before the court is whether Trokamed has sufficient contacts with Wisconsin to allow this court to exercise personal jurisdiction over that party. Both Morgan and Blue Endo oppose Trokamed's motion to dismiss, so the court will refer to them collectively as "the opposing parties."

---

[1] "Laparoscopic Power Morcellators," U.S. Food and Drug Administration, https://www.fda.gov/medicaldevices/productsandmedicalprocedures/surgeryandlifesupport/ucm584463.htm (last visited September 12, 2018).

The court will grant Trokamed's motion to dismiss for lack of personal jurisdiction. Although the court sees merit to the opposing parties' view that foreign manufacturers can be sued in Wisconsin if they have distribution agreements that cover all of the United States (as Trokamed does), the Supreme Court rejected that view in *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873 (2011). Because the opposing parties have not persuasively distinguished Trokamed's situation from that of the foreign manufacturer in *J. McIntrye*, Morgan cannot maintain her claim against Trokamed in this court.

ANALYSIS

A. **Legal background**

Generally, a federal district court must consider the requirements of both the Due Process Clause and state law when deciding whether the court may exercise personal jurisdiction over a defendant. *Ricoh Co. v. Asustek Computer, Inc.*, 481 F. Supp. 2d 954, 957–58 (W.D. Wis. 2007). But in this case, Trokamed does not develop an argument under state law, so the court will limit its analysis to the requirements of due process.

Federal courts recognize two types of personal jurisdiction: general and specific. *Daimler AG v. Bauman*, 571 U.S. 117, 126–33 (2014). A court has general jurisdiction when a defendant's contacts with the forum state are so substantial that the defendant can be sued in that state for any reason; specific jurisdiction focuses on the relationship between the plaintiff's claims and the defendant's contacts with the forum state. *Id.*

Morgan does not contend that the court can exercise general jurisdiction over Trokamed, so the court will limit its analysis to specific jurisdiction. The court of appeals has synthesized the Supreme Court's opinions on specific jurisdiction into three elements: (1) the

2

defendant must have purposefully availed himself of the privilege of conducting business in the forum state or purposefully directed his activities at the state; (2) the alleged injury must have arisen from the defendant's forum-related activities, and (3) the exercise of jurisdiction must comport with traditional notions of fair play and substantial justice. *Felland v. Clifton*, 682 F.3d 665, 673 (7th Cir. 2012).[2]

At this stage of the case, Morgan must "make a prima facie showing of jurisdictional facts." *Id.* at 672. The court may consider the allegations in the complaint and any evidence submitted by the parties and must resolve any factual disputes in favor of the plaintiff. *Id.*

**B. Trokamed's alleged contacts with Wisconsin**

Most of the parties' debate focuses on the question whether Trokamed purposefully availed itself of the privilege of conducting business in Wisconsin or purposefully directed activities here. It is undisputed that Trokamed does not have an office, employees, or sales representatives in Wisconsin. The opposing parties do not allege that any representative from Trokamed has visited the state or solicited business here. And there is no evidence or allegations that Trokamed has shipped products to Wisconsin. Instead, the opposing parties rely on the following evidence and allegations:

- the exclusive distribution agreement between Trokamed and Blue Endo;

---

[2] There is an alternative test for specific jurisdiction that the Supreme Court has applied in the context of intentional torts. *Calder v. Jones*, 465 U.S. 783 (1984). The court of appeals has applied the test as well, dividing it into three elements: "(1) intentional conduct (or 'intentional and allegedly tortious' conduct); (2) expressly aimed at the forum state; (3) with the defendant's knowledge that the effects would be felt—that is, the plaintiff would be injured—in the forum state." *Tamburo v. Dworkin*, 601 F.3d 693, 703 (7th Cir. 2010). Morgan does not rely on the theory articulated in *Calder*, presumably because she is not asserting a claim for an intentional tort. Blue Endo does cite the alternative test, but it does not develop an argument for applying the test in this case and it does not suggest that the outcome of Trokamed's motion should be different under *Calder*, so the court declines to consider it separately.

3

- statements from Blue Endo's president regarding collaboration between Trokamed and Blue Endo;

- documents showing that morcellators were sent to Wisconsin and allegations that replacement parts were sent here as well;

- a guarantee included in the "instructions for use" that accompanied the morcellator;

- the application that Trokamed submitted to the FDA and the agency's approval of that application;

- documents related to a November 2014 safety communication from the FDA about morcellators;

- testimony that a high-ranking officer at Trokamed came to Florida to meet with Blue Endo representatives.

The court will consider each alleged contact in turn.

## C. Exclusive distribution agreement

Morgan's primary argument relies on Trokamed's distribution agreement with Blue Endo, which gave Blue Endo the exclusive right to sell Trokamed's morcellators throughout the United States, Canada, and Mexico. Dkt. 9-2, § 1.5. By entering into that agreement, Morgan says, Trokamed demonstrated its intent sell its products in all 50 states, including Wisconsin. And because it could reasonably expect that its products would be sold in Wisconsin, it "could reasonably anticipate being haled into court" here as well. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

It is difficult to deny the logic of Morgan's argument, which is called the "stream of commerce" theory in the case law. And Justice Ginsburg has defended the theory forcefully in a similar case, *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873 (2011). The plaintiff in that case was injured by a scrap metal machine manufactured by a foreign company that used a distributor to sell its products throughout the United States, including New Jersey. In

concluding that a federal court could exercise jurisdiction over the manufacturer in New Jersey (where the distributor sold the machine at issue and the injury occurred), Justice Ginsburg wrote the following:

> Is it not fair and reasonable, given the mode of trading of which this case is an example, to require the international seller to defend at the place its products cause injury? Do not litigational convenience and choice-of-law considerations point in that direction? On what measure of reason and fairness can it be considered undue to require [the manufacturer] to defend in New Jersey as an incident of its efforts to develop a market for its industrial machines anywhere and everywhere in the United States? Is not the burden on [the manufacturer] to defend in New Jersey fair, i.e., a reasonable cost of transacting business internationally, in comparison to the burden on [the plaintiff] to go to Nottingham, England to gain recompense for an injury he sustained using [the manufacturer's] product at his workplace in Saddle Brook, New Jersey?
>
> . . .
>
> [The manufacturer], by engaging [its distributor] to promote and sell its machines in the United States, purposefully availed itself of the United States market nationwide, not a market in a single State or a discrete collection of States. [The manufacturer] thereby availed itself of the market of all States in which its products were sold by its exclusive distributor. The purposeful availment requirement . . . simply ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts.

*J. McIntyre*, 564 U.S. at 903–05 (Opinion of Ginsburg, J.) (internal quotations, alterations, and footnotes omitted). Justice Ginsburg's common-sense opinion strongly supports Morgan's argument in this case. The only problem is that Justice Ginsburg's opinion was the dissent, not the opinion of the Court.

The holding of the Court in *J. McIntyre* is not as easily stated as it is in most cases because no single opinion garnered at least five votes. But Justice Kennedy's plurality opinion and Justice Breyer's concurrence both rejected the lower court's holding that a foreign

5

manufacturer can be sued in any state if it "knows or reasonably should know that its products are distributed through a nationwide distribution system that might lead to those products being sold in any of the fifty states." *Nicastro v. McIntyre Machinery America, Ltd.*, 987 A.2d 575, 591–92 (N.J. 2010). *See J. McIntyre*, 564 U.S. at 882 (plurality opinion) ("The defendant's transmission of goods permits the exercise of jurisdiction only where the defendant can be said to have targeted the forum; as a general rule, it is not enough that the defendant might have predicted that its goods will reach the forum State."); *id.* at 890–91 (Breyer, J., concurring in the judgment) ("I am not persuaded by the absolute approach adopted by the New Jersey Supreme Court . . . . Under that view, a producer is subject to jurisdiction for a products-liability action so long as it 'knows or reasonably should know that its products are distributed through a nationwide distribution system that might lead to those products being sold in any of the fifty states.'").[3]

In attempting to distinguish the distribution agreement in this case from that in *J. McIntyre*, the opposing parties say that Trokamed exercised more control over Blue Endo than the manufacturer in *J. McIntyre* exercised over its distributor. *Id.* at 878 (plurality opinion) ("[T]here is no allegation that the distributor was under J. McIntyre's control."). For example, Morgan alleges in her brief that "Trokamed obligated Blue Endo to market and sell the device in Wisconsin." Dkt. 21, at 1. But Morgan does not support that allegation. The opposing parties do not point to any provisions in the distribution agreement that require Blue Endo to

---

[3] Several courts have concluded that Justice Breyer's concurrence is the controlling opinion because it represents the narrowest ground supported by a majority of the Court. *E.g.*, *Williams v. Romarm, SA*, 756 F.3d 777, 785 (D.C. Cir. 2014); *AFTG-TG, LLC v. Nuvoton Tech. Corp.*, 689 F.3d 1358, 1363 (Fed. Cir. 2012); *Hubert v. Bass Pro Outdoor World, LLC*, No. 15-cv-47, 2016 WL 4132077, at *5 (S.D. Ill. Mar. 16, 2016). This court concludes that both the plurality and concurrence require Trokamed's dismissal from the case.

market or sell in Wisconsin or that even *mention* Wisconsin (or any other state or region within the United States). Rather, the agreement states that Blue Endo is "an independent contractor" that "retain[s] exclusive control over its employees, agents, contractors and business practices." Dkt. 9-2, § 2.1 Blue Endo is permitted to sell "to any person or entity" and can use "sub-distributors or sub-contractors in its sole discretion." *Id.*, § 3.4.

The opposing parties cite two other provisions in the agreement as evidence of Trokamed's control. The first provision requires Blue Endo to use "commercially reasonable efforts to assign adequately trained and reasonably sufficient sales staff to market and sell Exclusive Products(s) and Product(s)." *Id.*, § 4.1. The second provision states that Trokamed may issue a "deficiency notice" if Blue Endo does not purchase the "annual Product Quota." *Id.*, § 3.2. (Neither side explains the consequences of a deficiency notice.)

Neither provision shows that Trokamed exercised control over Blue Endo that would distinguish it from the manufacturer in *J. McIntyre*. Both provisions are directed at increasing sales in the territory as a whole, but neither provision directs Blue Endo to market or sell products in Wisconsin or otherwise purports to control *where* Blue Endo will sell the product within the United States, Canada, or Mexico. Because that is the type of control that matters under a personal jurisdiction analysis, the court concludes that the Trokamed's and Blue Endo's distribution agreement does not provide a basis for suing Trokamed in Wisconsin. *J. McIntyre*, 564 U.S. at 889 (Breyer, J., concurring in the judgment) (court in New Jersey could not exercise jurisdiction over British manufacturer because the plaintiff "has shown no specific effort by the British Manufacturer to sell in New Jersey").[4]

---

[4] A quota might be relevant to a personal jurisdiction analysis if the quota were so large that the distributor would need to sell the product in nearly every state to meet the quota. But the opposing parties do not identify what the quota was or otherwise allege that meeting the quota

In sum, because Trokamed's distribution agreement with Blue Endo does not target Wisconsin in any way, the agreement by itself does not provide a basis for this court to exercise jurisdiction over Trokamed in this case.[5]

**D. Sales in Wisconsin**

Morgan (but not Blue Endo) says that sales of Trokamed's morcellators in Wisconsin provide another ground for distinguishing *J. McIntyre*. Morgan relies on Justice Breyer's concurrence, in which he observed that "the relevant facts found by the New Jersey Supreme Court show no regular flow or regular course of sales in New Jersey." 564 U.S. at 889. The plurality opinion stated that "no more than four machines (the record suggests only one), including the machine that caused the injuries that are the basis for this suit, ended up in New Jersey." *Id.* at 878 (plurality opinion) (citation omitted). Both the plurality and the concurrence relied on the small number of New Jersey sales to support the conclusion that the foreign manufacturer did not have sufficient contacts with the state.

In this case, Morgan has identified only two sales of Trokamed's morcellators in Wisconsin, including the one at issue in this case. Dkt. 21, at 12. That is no different from the one to four sales at issue in *J. McIntyre*.

---

required such a sales effort.

[5] For the same reason, the court is not persuaded by testimony from Blue Endo's president that Blue Endo and Trokamed discussed "how to market and sell the product." Dkt. 21-2 (Dep. of Theodore Sullivan 48:17–20). The opposing parties do not cite any testimony in which Trokamed directed Blue Endo to sell or market products in Wisconsin. And the Supreme Court was not persuaded by similar evidence in *J. McIntyre*. 564 U.S. at 878–79 (plurality opinion) (noting evidence that the U.S. distributor "structured [its] advertising and sales efforts in accordance with" J. McIntyre's "direction and guidance whenever possible").

Morgan resists this conclusion on the ground that the morcellators include disposable components such as blades and valves. Morgan alleges (without citing evidence) that Blue Endo "regularly" sent those components into Wisconsin. Dkt. 1, ¶ 12.

There are several problems with Morgan's reliance on the possibility that Blue Endo regularly shipped disposable components to Wisconsin. First, Blue Endo itself did not make this claim in its opposition brief. Because Blue Endo would be in the best position to know what products it shipped to Wisconsin, its silence on this issue undermines the plausibility of Morgan's allegation.

Second, even if the court accepts the allegation as true, Morgan does not say where Blue Endo obtained disposable parts, so it is not clear whether the parts came from Trokamed. Again, Blue Endo is silent on this point.

Third, Trokamed denies that it knew that it had customers in Wisconsin at the relevant time and Morgan does not contradict that view. Even under the more permissive view of the stream of commerce theory that the Supreme Court rejected in *J. McIntyre*, Morgan would have to show that Trokamed knew or should have known that its products were being sold in Wisconsin. *J. McIntyre*, 564 U.S. at 877. *See also Walker v. Macy's Merch. Grp., Inc.,* No. 14 C 2513, 2016 WL 6089736, at *4 (N.D. Ill. Oct. 12, 2016) (sales of jackets in Illinois did not show purposeful availment because the manufacturer "kn[]ew[]that the jackets were going to be sold somewhere in the United States," but "had no knowledge that they would ever reach or be sold in Illinois specifically").

Morgan alleges that Trokamed became aware of its Wisconsin customers in 2015, after the FDA asked Trokamed to update its "instructions for use." Dkt. 1, ¶ 31. But even if that were true, that was after the relevant events in this case (Morgan's surgery was in 2014).

9

Morgan does not explain how knowledge that Trokamed had in 2015 could serve as the basis for an exercise of jurisdiction for a claim arising out of a 2014 injury and a morcellator sale made years earlier. 16 James William Moore, *Moore's Federal Practice* §108.42[2][a] (3d ed. 2018) ("The proper focus in the specific jurisdiction analysis is on those contacts leading up to and surrounding the accrual of the cause of action. Later events are not considered.").

Fourth, Morgan cites no authority for the view that sending minor replacement parts for two devices would qualify as a "regular flow" of sales in Wisconsin. *Tile Unlimited, Inc. v. Blanke Corp.*, 47 F. Supp. 3d 750, 760 (N.D. Ill. 2014) (in determining whether the defendant purposefully availed itself of the state market, both "[t]he number of transactions" and "the dollar amounts derived from" those transactions are relevant considerations). And Morgan does not allege that her injury had anything to do with the blades or valves of the morcellators, so those sales would have a more tenuous connection with her claims. *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 801 02 (7th Cir. 2014) ("Specific jurisdiction must rest on the litigation specific conduct of the defendant in the proposed forum state. The only sales that would be relevant are those that were related to [the defendant's] allegedly unlawful activity."); *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1278 (7th Cir. 1997) ("[S]pecific jurisdiction is not appropriate merely because a plaintiff's cause of action arose out of the general relationship between the parties; rather, the action must directly arise out of the specific contacts between the defendant and the forum state.") (internal quotations omitted).

The opposing parties have failed to make a prima facie showing that Trokamed has a regular flow of sales in Wisconsin as to products that are related to Morgan's claims.

E.  **Instructions for use**

In *Asahi Metal Industry Co. v. Superior Court of Cal., Solano Cty.*, four justices concluded that a court may exercise specific jurisdiction over a foreign defendant that places a product into the "stream of commerce" if the defendant also "establish[es] channels for providing regular advice to customers in the forum State." 480 U.S. 102, 112 (1987) (plurality opinion). Similarly, Justice Breyer stated in his *J. McIntyre* concurrence that "special state-related . . . advice" might qualify as "something more" that justifies exercising jurisdiction over a foreign manufacturer whose product ends up in the forum state. 564 U.S. at 889.

In this case, the opposing parties say that the court may exercise personal jurisdiction because Trokamed established channels of advice by offering a warranty to customers. The opposing parties cite "Instructions for Use," or IFUs, that accompanied each of Trokamed's morcellators sold in the United States. The IFUs included the following language:

> **Scope of guarantee**
>
> The manufacturer guarantees that the product is shipped in perfect order with regard to function, safety, and reliability. This guarantee becomes null and void in case of:
>
> - Unauthorized repairs
>
> - Product alterations
>
> - Disregard of the applicable laws and regulations for electrical installations
>
> - Improper use
>
> - Opening of the grip module, control unit or foot pedal housings.

Dkt. 10-1, at 47.

The parties debate the meaning and significance of this language. According to Trokamed, it did not provide a warranty to its American customers.[6] Rather, Trokamed says that any guarantee provided in the IFUs was made by Blue Endo.

Trokamed ignores the fact that the guarantee refers to the "manufacturer," not the distributor. Trokamed also fails to address the testimony of its president that "the guarantee is from the producer of the product, and it doesn't stop if you sell it through a dealer, it always goes with the product." Dkt. 21-4 (Trondle Dep. 143:4–7). But even if the court assumes that the guarantee came from Trokamed, the reasoning in *Asahi* on which the opposing parties rely relates not to "guarantees" but to established channels of communication between the manufacturer and the customer.[7]

This is where the opposing parties' argument fails: the opposing parties have not a made a prima facie showing that Trokamed established a channel of communication with any

---

[6] In fact, Trokamed says that it disclaimed any warranties, citing the following language in its distribution agreement with Blue Endo:

> EXCEPT FOR THE EXPRESS WARRANTIES MADE HEREIN, NEITHER PARTY MAKES ANY REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, AS TO THE MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE CONCERNING THE PRODUCTS, AND EACH PARTY SPECIFICALLY DISCLAIMS ANY OTHER WARRANTY, EXPRESS OR IMPLIED, OTHER THAN THAT CONTAINED HEREIN.

Dkt. 9-2, § 8.3. Trokamed does not explain why a disclaimer directed at Blue Endo would affect any warranties made to the buyer. Because the disclaimer is not dispositive, the court will assume that it did not apply to any statements in the IFUs.

[7] In *J. McIntyre*, 564 U.S. at 894, the dissent also relied on a document from the manufacturer that guaranteed serviceability "wherever [its customers] may be based." But presumably neither the plurality opinion nor the concurrence found that piece of evidence to be probative because neither opinion mentioned it.

Wisconsin customer. The language cited by the opposing parties is part of a section in the IFUs called "Guarantee Repair." Dkt. 10-1, at 47. In that section, the IFUs direct the customer to send the device to *Blue Endo* for repairs and they provide Blue Endo's address, telephone number, and email address. *Id.* Every page of the IFUs include Blue Endo's logo. The beginning of the IFUs state that the morcellator is "a product from BLUE ENDO" and that the IFUs "are the intellectual property of BLUE ENDO." *Id.* at 3 (emphasis in original). Neither the "Guarantee Repair" section nor any other part of the IFUs provides any contact information for Trokamed, identifies Trokamed as the manufacturer, or even mentions Trokamed. [8]

No one reading the IFUs would know that he or she should contact Trokamed for any reason. And the opposing parties do not allege that either of the two customers in Wisconsin ever had any communication with Trokamed. Under these circumstances, the court concludes that the opposing parties have not made a prima facie showing that Trokamed established channels of communication with Wisconsin customers.

**F. FDA documents**

The opposing parties rely on two sets of documents related to the FDA: (1) Trokamed's application and the FDA's approval of Trokamed's request to sell its morcellator in the United

---

[8] Trokamed provided the IFUs with its motion to dismiss and the opposing parties did not challenge the authenticity of the document or otherwise allege that Trokamed provided the wrong version. But Morgan attached a different version of the IFUs to her opposition brief. Dkt. 21-5. That version is written in both English and German. It replaces all references to Blue Endo with Trokamed and provides Trokamed's contact information in the "Guarantee Repair" section. *Id.* at 49. Trokamed says that the version Morgan attached was not circulated in the United States. Dkt. 30, at 21 n.16. Neither Morgan nor Blue Endo alleges that the version Morgan submitted was ever sent to Wisconsin and they do not allege that Wisconsin customers received Trokamed's contact information or any other information about Trokamed. Accordingly, the court concludes that the alternative version of the IFUs does not create a factual dispute.

States; and (2) documents related to the FDA's November 2014 request to Trokamed to update its IFUs. The first set of documents is not helpful because, like the distribution agreement, it relates to Trokamed's contacts with the United States generally rather than Wisconsin specifically. *J. McIntyre*, 564 U.S. at 884–85 (plurality opinion) ("[A] litigant may have the requisite relationship with the United States Government but not with the government of any individual State."). For this reason, other courts have concluded that the process for FDA approval does not provide a basis for exercising jurisdiction in a particular state. *E.g.*, *Wilson v. Nouvag GmbH*, No. 15-CV-11700, 2018 WL 1565602, at *4 (N.D. Ill. Mar. 30, 2018) ("While the FDA submissions here unquestionably demonstrate Nouvag AG's intent to have its morcellator reach the United States market, they do not demonstrate any intent to target Illinois specifically.").[9] The court agrees with the reasoning of those cases.

As for the second set of documents, the parties debate the extent of Trokamed's involvement in complying with the FDA's November 2014 request. But the court will accept as true the opposing parties' version of events: (1) after receiving the request from the FDA, Trokamed directed Blue Endo to update the IFUs and deliver them to all customers, which Blue Endo did; (2) Trokamed directed Blue Endo to prepare a spreadsheet that contained the contact information of its American customers; and (3) Trokamed used the spreadsheet in communications with the FDA.

---

[9] *See also Sarver v. Johnson & Johnson,* No. 14-cv-19968, 2016 WL 482994, at *5 (S.D.W. Va. Feb. 5, 2016) ("Proxy's submission . . . to the FDA is with the United States in general, not any specific state. The facts suggest nothing more than the possibility that Proxy products might be sold in New Jersey, which the Supreme Court rejected as grounds for specific jurisdiction in *McIntyre*."); *Tile Unlimited, Inc. v. Blanke Corp.*, 47 F. Supp. 3d 750, 761 (N.D. Ill. 2014) ("Nor does the fact Blanke Germany's products comply with United States regulations demonstrate a deliberate attempt to serve the Illinois market.").

Even if true, these allegations do little to support the opposing parties' position. The allegations again relate to Trokamed's contacts with the United States generally rather than Wisconsin specifically and they arise out of conduct that occurred after Morgan was injured. Morgan does not contend that her claims arose out of the updated IFUs. *Felland*, 682 F.3d at 673 (to support an exercise of specific jurisdiction, "the alleged injury must have arisen from the defendant's forum-related activities").

Blue Endo suggests that Trokamed established a channel of communication by updating the IFUs, but it fails to explain how. The opposing parties do not allege that Trokamed had any direct communication with any Wisconsin customer during the updating process or that Trokamed invited communication from customers. And neither Morgan nor Blue Endo cites any authority in which a court found that similar conduct was sufficient to justify an exercise of personal jurisdiction. For these reasons, the court concludes that Trokamed's contacts with the FDA do not provide a basis for exercising jurisdiction over Trokamed in this case.

## G. Trondle visit

Morgan cites testimony from Blue Endo's president that in 2012 in Florida he met with Karlheinz Trondle, who the parties refer to alternatively as the "manager," "general manager," and "president" of Trokamed. Dkt. 21, at 2; Dkt. 30, at 17; Dkt. 26, at 5. Because this meeting occurred in Florida and the opposing parties do not allege that the meeting had anything to do with Wisconsin in particular, it does not provide a basis for exercising personal jurisdiction over Trokamed in this case. *J. McIntyre*, 564 U.S. at 878–79 (plurality opinion) (attendance at conventions in other states to advertise and promote product did not provide basis for exercising jurisdiction in New Jersey); *id.* at 888 (Breyer, J., concurring in the judgment) (same).

**H. Other cases**

For the sake of completeness, the court will briefly address four cases that the parties rely on, three of which also involved a products liability claim against Trokamed related to its morcellators. Of the three cases filed against Trokamed, two were dismissed for lack of personal jurisdiction and one was allowed to proceed. But two of the cases provide little guidance to other courts. In *Schmidt v. Trokamed*, No. 15-1-2347 (Haw. Cir. Ct. Jan. 12, 2018), the court concluded that it could not exercise jurisdiction over Trokamed, and in *Johnson v. Market-Tiers Inc.,* No. 15C2984 (Tenn. Cir. Ct. Feb. 28, 2018), the court concluded that the plaintiff had made a prima facie case of personal jurisdiction over Trokamed. But *Schmidt* was a one-page order that did not provide reasoning for the court's decision. Dkt. 10-3. The court in *Johnson* concluded that Trokamed "controlled" the distribution of its morcellators in the United States by imposing quotas, but the court did not explain how the quotas were relevant to the jurisdictional analysis. Dkt. 21-10.

The third case is consistent with this court's analysis. In *Trokamed GmbH v. Vieira*, No. 01-17-485-cv, 2018 WL 2436610, (Tex. Ct. App. May 31, 2018), the Texas Court of Appeals concluded that the same alleged contacts that are at issue in this case did not provide a basis for exercising personal jurisdiction in Texas:

- the exclusive distribution agreement is "not specific to Texas but covers the U.S., Canada, and Mexico," and "Trokamed has not participated in the delivery of its products to Texas," *id.* at *6;

- the IFUs "are the intellectual property of Blue Endo" and "bear Blue Endo's logo and contact information," *id.* at *7;

- Trokamed's contacts with the FDA were not state specific, *id.*;

- Blue Endo was not acting as Trokamed's "agent," *id.* at *8.

16

Because *Vieira* reached the same conclusions as this court, it is not necessary to discuss the case further.

In the fourth case, the Court of Appeals for the Sixth Circuit concluded that a court in Kentucky could exercise jurisdiction over a foreign pharmaceutical company, relying on the following contacts:

- the defendant's efforts to obtain FDA approval allowed the defendant to exploit the markets of each state in the United States;

- the defendant had a distribution agreement that included all of the United States;

- the defendant conducted clinical studies in the United States.

*Tobin v. Astra Pharm. Prod., Inc.,* 993 F.2d 528, 543–44 (6th Cir. 1993). The view adopted in *Tobin* is same as that adopted by the dissent in *J. McIntyre*. As multiple courts have recognized (including the court in *Vieira*), *Tobin* is inconsistent with the plurality and concurring opinions in *J. McIntyre*. E.g., *Crowell v. Analytic Biosurgical Sols*., No. 12-cv-6072, 2013 WL 3894999, at *5 (S.D.W. Va. July 26, 2013) ("*Tobin* and *J. McIntyre* used similar reasoning to analyze the issue of personal jurisdiction, but where *Tobin* found that personal jurisdiction existed, *J. McIntyre* did not."); *Oticon, Inc. v. Sebotek Hearing Sys., LLC*, 865 F. Supp. 2d 501, 513 (D.N.J. 2011) ("*Nicastro* overruled the line of cases exemplified by *Tobin*, . . . which held to the contrary."). For this reason, this court declines to follow *Tobin*.

I. **Conclusion**

"With the free flow of commerce within the United States today, it may seem counterintuitive that a foreign manufacturer . . . who sells goods to a distributor in the United States should not be assumed to have the expectation that its goods may end up for sale in any one of the fifty states." *Jennings v. AC Hydraulic A/S*, 383 F.3d 546, 551 (7th Cir. 2004). But

that is the current law of the Supreme Court; a foreign manufacturer cannot be sued in a particular state simply because a distributor sold the manufacturer's products there.

The bottom line is that the opposing parties have failed to make a prima facie showing that Trokamed purposefully availed itself of the privilege of conducting business in Wisconsin, or if it did, that Morgan's injury arose out of Trokamed's relevant conduct directed at this state. The facts alleged by Morgan "may reveal an intent to serve the U.S. market, but they do not show that [Trokamed] purposefully availed itself of the [Wisconsin] market." *J. McIntyre*, 564 U.S. at 886 (plurality opinion).

This conclusion makes it unnecessary to consider whether the exercise of jurisdiction over Trokamed would comport with traditional notions of fair play and substantial justice. *Felland*, 682 F.3d at 673. And because Morgan does not request jurisdictional discovery or identify any discovery that she would seek if she had the chance, the court does not consider that issue either. *Philos Techs., Inc. v. Philos & D, Inc.*, 802 F.3d 905, 912 (7th Cir. 2015) (court may consider request for jurisdictional discovery "if a party so requests").

ORDER

IT IS ORDERED that the motion filed by defendant Trokamed GmbH for lack of personal jurisdiction, Dkt. 7, is GRANTED and Trokamed is DISMISSED from the case. The stay on discovery is LIFTED.

Entered September 14, 2018.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge